Right now we will call our first case of the day, Maccari v. Bituminous Casualty Corp. May it please the court, good morning, your honors. John Spadaro for the appellants, Nicholas and Victoria Maccari, and with the court's indulgence I'd like to reserve three minutes for my rebuttal. Your honors, this appeal contests the district court's application of the summary judgment standards regarding inadmissible coverage to ensure a motorist claim. Could you have the microphone a little closer? I want to make sure that everyone can hear you. If I had to distill the chief points... Are you reserving for a rebuttal, did you indicate? Yes, I indicated, your honors, three minutes for my rebuttal. All right, thank you. If I had to distill the chief points of the appeal in just a few minutes, I think I'd say this. First, your honors, let us suppose that two parties are debating the value of a used car. The buyer says $5,000, the seller says $10,000, and they're making a bonafide dispute as to which of those two figures comes closer to the actual value of the car. There is no reason for the dispute that the car is worth at least $5,000. Mr. Spadaro, let me ask you a question. Your complaint is framed such that you contend that from and after the time of surgery, your complaint talks about 2006, does it not? It does. Okay. From and after the time of surgery, it was bad faith and unreasonable for the insurance company not to offer money, and they did not do so until roughly eight months later? Roughly eight months later, roughly seven months from their own post-surgery evaluation. Okay. But the doctor for your client indicated after surgery that he would need several months in order to determine, I think six to ten months? Six months at least. Six months at least to determine whether, in fact, your client is better or is his condition. So why is it unreasonable, let alone bad faith or malicious or recklessly indifferent, for an insurance company to not await the outcome of that before throwing some money on the table? Because, for a couple of reasons. By the time he gets the surgery, and more importantly, in May 2006, by the time the insurance company is already informed by their deposition of the claimant, informed by their own doctor-for-hire's independent or so-called independent medical examination of the claimant. Are you talking pre- or post-surgery? That was pre-surgery. Yeah, well, surgery could have made him all better. Well, and then informed by the surgery itself and the operative notes. They know from the operative notes, they know what's gone before. Okay. But no one, if an insurance company never has to make an offer, we're talking about permanent, lifetime injuries. And their own IV doctor had already said the injuries were permanent. And nothing in the surgical records or post-data ever contradicted that. In fact, the treating physicians continue to say he'll have these injuries for the rest of his life. But the degree is at issue, right? The degree that was at issue that went to the sole issue of what his projected future loss earnings would be. But they already know. Well, and it was never disputed that he could work at a sedentary job. Isn't that correct? Even at a media job. Well, their doctor said perhaps a media job. But if you're dealing with a preponderance of evidence standard, their doctor said. He could have been a judge. Yeah. Well, so he asked a designee what it was like to be in this insurance company. And remarkably, he didn't give the example of being a judge. He gave the example of somebody holding a traffic sign. That's what I do. So we reach a point where despite the dispute about whether it's going to be $420,000 in future loss earnings, which we said, or $65,000 in future loss earnings, which they said post-surgery, they know that he's already suffered $200,000 in hard, objective, already incurred financial loss. And they've already priced pain and suffering at $295,000. So all of that about future loss earnings can be taken off the table. And their own evaluation post-surgery with the benefit of medical records is that they've already got a claim that's worth approximately $500,000. But if Pensa says, I'm going to need six months, I'm the insurance company. I'm going to say, I'm going to wait because he could well say that, you know, the guy's just fine. And then that would be the, you know, really terrific evidence that we don't have to pay a lot of money. I'm just looking for kind of an aha moment where you say, okay, is it this moment? There is no doubt in anyone's mind that at least this amount of money should have been put on the table. At what moment was that? The aha moment is the May 2006 memo of the senior claims adjuster. Is that the point at which your cause of action proves bad faith? That's the point. Spring of 2006. Yes, sir. That's the point at which bad faith occurred. Because at that point, again, we're using their projections, which we think were pitifully low. We're using their projections of $65,000 for the SOF members. But that's not what happened in May. Bauer emailed that most of the values are still inconclusive. File evaluation worksheet, the value is negligible based on the results of surgery. I mean, I'm not finding that May is really helping you that much. Plus at that time there was knowledge that there were videos showing that this guy was doing things that arguably he was saying he couldn't do. And this is certainly an important factor in his credibility in determining what the cases were. Well, Your Honor, the record doesn't confirm that he said he couldn't do these things. At his deposition and in his conversation with their independent medical examiner, he said, I have tried to work, and I do help my brother fix cars on occasion. There was no secret about that. It was consistent with what everyone agreed, which is that there was at least light duty going forward. But when you get to May 2006, and you see Cindy Jester writing negligible in her notes, in the same file evaluation worksheet, she's writing it has a verdict value of $500,000 on the high end. It has a summary value of $650,000. So you ask the designee, what does she mean by negligible? And the designee said, I don't know what she means by negligible. I would never call this my negligible. And of course, it's nonsensical to record in the same document. I'm sorry. No, go ahead. To record in the same document that it has a summary value of up to $650,000, a verdict value at the high end of $500,000, their own reserve is a six-figure reserve, and the claim is negligible. What's the standard that you must meet in order to receive the different components of damage? You're not seeking compensatory because you've already gotten that. You're seeking, what, interest costs, punitives? Punitive damages is essentially the measure of damages. So how do you fit this within a reckless indifference or malicious, particularly egregious, standard? Well, particularly egregious standards have been articulated by the Federal Supreme Court. It's not that hard. It's easy for a juror to understand. It's an I don't care attitude. And that's from Tackett. That's from Jardel. That's from the state of the case. It's an I don't care attitude. So let's look at the evidence. They start off by saying in March 2004, we're going to need a medical examination. But they don't schedule it in March or April or June or July or for the entire year of 2004. Wait, but you're in 2004. We're not in 2004. Your complaint is 2006. Can any claim from 2004 be barred by the statute of limitations? A claim for bad faith would be barred by the statute of limitations. But in order to judge the indifference, if they showed indifference in the claim in 2004, if they declared, well, we show our indifference in this claim in 2004, is that not prohibitive of the attitude two years later? So you're talking evidence, not acts that would give rise to the cause of action. You're talking about supporting corroborative evidence that might be offered. We're talking evidence that might be offered to show the I don't care attitude and meet that element, which is the element for chemical damages. Prior to the approval of the cause of action. Both prior to and after. If I can go through the continuum very briefly. They ignored a $650,000 demand for over a year. They ignored a $900,000 demand, even after they concluded by an itemized valuation that the hard numbers totaled over $500,000. They used surveillance to, in their words, undermine the claim. And there, that means that as well. You were not a member of 2005. Was it their activity that would be taken to constitute an offer at that time? Well, not in the summary judgment standard, no. Their account is that there were two offers made in 2005. Mr. McHenry's lawyer testified under oath as an officer of the court and there's no convening testimony from the other lawyer who was supposedly making the offers, even though he worked for them. He testified that no offers were made. If you read the district court's decision, it says in the text that these offers were made. And then it drops a footnote and says, but the downloading parties claimed that it didn't happen. That terms summary judgment precisely when it said the only inference available procedurally now is that those offers were not made. And, of course, there's no direct physical evidence, no letter saying I'm offering this money. And we were precluded by the district court, although from getting at that issue in greater detail because of their privilege claims. But when you look at this nonsensical file valuation worksheet post the surgery, doesn't that show a difference? How am I calling a claim that I say may settle up to $650,000 and has a 60-day reserve and has this high end and half a million dollar burden? How am I calling that negligible? And how am I not being called to account by superiors to go on selling this stuff? Why is no one saying, what the heck do you mean negligible? What does negligible mean? And their designee says, I don't know what she means. That didn't look negligible to me. So that's evidence of indifference. Then in November of 2006, Ms. Bauer tells her superiors, and this is just two months before filing arbitration, the plaintiff has made no demand. Well, of course, we've been making demands for years. But she doesn't know. She apparently doesn't care. Can I have a reasonable jurist look at that evidence and say, well, there were indifference to the claim? Not only that, they might even have an attitude of contempt toward the claim. But no supervisor says, well, I've seen you and you say there's no written demand. They're too very significant. No, there's a $900,000 risk. Let's assume that we agree with you on the argument you've made so far and concluded that you should get an opportunity to look at the bad faith claim. You also have a punitive damages claim here. Yes, sir. What evidence do you have that supports the punitive damages claim? Well, the punitive damages standard in Delaware is this evincing of an I don't care attitude. We shouldn't be limited simply to evidence of indifference post the bad faith. They've been handling this claim. They said they've been investigating it since 1999. So you're suggesting that you should have an opportunity to offer evidence in support of the punitive claims for actions taken or not taken, for what the final activity demonstrates prior to the approval of the cause of action? Yes. Because, in fact, we cited a decision in the Florida Supreme Court which says just that. But if you're going to try and figure out this mental state of indifference, you have a right to present the entire claim system. You can be indifferent to a claim prior to the point at which reasonableness and the bad faith standard requires you to finally act on it and make an offer. And you can be indifferent afterward. We have evidence of both. Although that's kind of like a slippery slope. Your claim is that from and after early 2006 there was bad faith. Yes, ma'am. For you to use evidence from before kind of seeks to get that claim back earlier, it seems to me. That's not evidence of bad faith. The evidence from before is evidence of the indifference act. It's a two-tiered show in a deadwood law. Bad faith is not about indifference. It's simply unreasonable delay or unreasonable delay. Now, your bad faith claim is interest in costs, correct? And your punitive damages claim, well, your egregious or I don't care attitude is the punitive damages claim. Exactly. The punitive damages are not available merely in a show of bad faith in a deadwood law. We have to meet the second tier, which is the indifference show. You mentioned the bad faith by the point in time at which they've done what their own designee called a detailed economic analysis. And he agreed. Their lawyers disagreed. But he agreed that the scene claim congester said $250,000 in pain and suffering alone, over $200,000 in objective heart costs. This is informed again by they've already had the surgery, the IME, and the deposition. My time is up, Your Honor, so I appreciate your indulgence. Thank you. We'll hear from you on rebuttal. I'm sorry. I wasn't paying attention. It's all right. May I please report? My name is Michael Polk, and I represent the accountants of this casualty company. I have three basic points for you, Your Honor. Number one, there were no genuine material issues of fact. They conceded that during your argument on somebody's judgment, and the record supports that. Number two, those facts support the district court's holding. The plaintiffs cannot meet the basic test of bad faith under Delaware law. That is very clear. Are there issues of fact as to whether this November $50,000 and $150,000 offer was put on the table, and wouldn't that make a difference? No, Your Honor, it doesn't. They talk a lot about making an offer. Look at the negotiation history here. They came in at $650,000 early. We finally got a medical exam of this man, and they immediately raised to $900,000. If we were playing bridge and you consider that a take-out bid, they're not negotiating, they're just laying out big numbers in there. We made an offer of $150,000. There's an affidavit in the record from Plaintiff's Counsel saying, I told them that was way too low. They say they didn't get it, but there was an oral discussion between counsel. If I get $150,000, will you take it? They said no. At any point in time, even if you take everything that they say about the documents, which I think is very unfair, given the documents being everything that's in the claims file, if they introduce 4,000 pages of claims files, it wouldn't be a stop-the-prices moment if I told you that there's sometimes claims files that are a little confusing as to what the people really mean by it. Well, like the entries around, I think, May of 2006, that could suggest that the carrier itself was valuing this claim total at about $543,000. It could be wrong. It could be wrong. It's a question of fact. At that point, the demand for the claim was $900,000. So this notion that we have an obligation to throw numbers on the table, even though they're not interested in accepting those numbers. Well, accepting the $543,000 at that point is in rather stark contrast to the other numbers discussed by the carrier and other points in the claims history. There's no question that what that document says is the Blackboard numbers say this. There's very little medical expense at that time, and the biggest question was lost wages. This man had very little employment history prior to the accident, and here we are almost seven years later when he first time had surgery on this thing. So there's a lot of questions. The other thing you want to keep in mind, one other thing, those numbers that we're talking about in May, remember somehow, we've only got $100,000 paid by State Farm. This is in excess of that. So we're entitled to a credit for that amount that State Farm never paid. But the one thing that's clear from these records, there's a bonafide dispute as to his condition. As Judge Rundle said in the beginning, there's a question from the bone doctor saying this is a very good surgery. We'll need six to 12 months to know whether it's going to be successful or not, which is to speak to whether or not he's going to have a lifelong unemployment claim or whether it's going to be he's going to be able to go back to work and be much better. The appellants make much in their brief of the use by Ms. Bauer of a particular word, that is, that the investigators could undermine Mr. McKay's claim. Isn't that significant, at least for some of the judgment purposes, in terms of possibly characterizing the conduct of the carrier and its adjustments? I don't believe that's a fair argument, Your Honor. It's one word taken out of the context. And, in fact, the question was if the plaintiffs are making a You would agree, though, that it's not appropriate for a first-party carrier to be trying to undermine the claim when it's insured. That's correct. But, on the other hand, it's also not appropriate for a first-party claimant to make a demand that's so far above and beyond the real facts of the case that you put this into an adversary situation. They created the adversary situation. We're responding to it. We're trying to do our best job possible to evaluate the case. And one thing, we have to be very clear here, these people walked away from an incompensatory claim. So they don't want to make a compensatory claim. That's why we start off with the Taffet case where the court said there's no bad faith case if, in fact, the denial of benefits was clearly without any reasonable justification. And now we go to a heightened standard of punitive damages where the Taffet case doesn't say anything about I don't care. The Taffet case says it has to be particularly egregious. It has to be outrageous conduct, evil motive, reckless indifference. Let me ask you a question. What's the matter with the term undermine? I mean, to me, it's when someone comes from when you build a castle and you had a wall. And if you wanted the wall to go down, you build a tunnel under it and it removed the support. And you're seeking to remove, validly remove the support of the figure that the other side's claiming. I think, Your Honor, it's a term that gets used more usually when you're opposing what's a third-party claim. I'm just sincere as first party. This is the correct claim for your purposes. Yeah, absolutely. On the other hand, when you're trying to figure out what the right value is of the claim and the plaintiffs lawyers are saying, oh, it's way up here, even though they had three arbitrations where they lost that same kind of argument, this is a different situation. So I think it wasn't an attempt to undermine the claim. It was enough to deal with what the claimants are claiming. Well, I mean, that's the way I understood it. I think the record is clear. It's a bona fide dispute. And if you look at Tackett, if you look at Nielsen, if you look at Case and I'm so excited about his decision, you'll find a bona fide dispute means there can be no punitive damages. And since they weren't seeking medical care, they're bound by this higher standard. And I would call the Court's attention to the Delaware Supreme Court case and the Fay v. Sheehan case where the Court said, an insurer is not guilty of bad faith in refusing to pay benefits in the face of unresolved questions concerning the plaintiff's physical condition. It seems to me that's what we have here. The worst we have here on their interpretation of the claims file, I would call the Court's attention to the Thurston case where the Court said, a mere lack of judgment, incompetence, or bureaucratic infusion will not support a claim of punitive damages for an insurance company. Delaware law is pretty clear, but there's been almost never, I have not found a decision from the Delaware Supreme Court on appeal that if a judgment is made against an insurance company for punitive damages, this case clearly doesn't come close to some of the other cases. Anybody who's handled insurance claims, whether it's been on behalf of a plaintiff or for a carrier, knows that it's not uncommon for the negotiations to go on for a period of time, especially whereas here, the plaintiff's condition may be changing and the plaintiff is subject to what occurred here, which is serious surgery. And that that can impact profoundly on evaluation of the claim. But it also seems to me that whether it's a plaintiff relying upon some period of time passing or whether it's a defendant for purposes of evaluating the claim, something might appear somewhere that suggests that this is what we're doing. We want to have more time to assess the impact of the surgery, the surgery itself, its post-op effects on the ability to work. Is there anything in the claim file that suggests that the carrier here ever communicated that intent to anyone? Yes, Your Honor. There were several instances after the surgery where we wrote to the plaintiff's lawyer telling them we're trying to get more medical records. We didn't get the full medical records after the surgery. We wanted to evaluate that. And the other problem here was there was an arbitration proceeding coming up, and the carrier did not want to be accused of bad faith by delaying the arbitration hearing that the plaintiff had requested. So it was kind of in a box where the doctor said it was going to take between 6 months and 12 months to evaluate the condition, and the plaintiff was going ahead with this arbitration hearing. I don't know how the court could rule that there's something wrong with what the company did there. They tried to be reasonable. The other thing that's weird about this case, quite frankly, suppose they had offered $500,000 in May or June or July, and the plaintiff was going to take it. He had a $900,000 amendment. He walked out with a million. So it would almost be like, I don't know, what would the harm have been if he would have taken less money, if he would have offered less than what the case is worth, we could potentially be able to finish the problem. It was a very difficult case to evaluate. He had very low loss wages. He had very low medical costs for long years. It was seven years after the accident that he had the first surgery. Is it unusual, though, for, you say there's no genuine issue of fact, but these matters are all a matter of your perspective. You read 4,000 pages of records. You read Bauer's use of terminology. You use this. You get a feel for what's going on here. Why shouldn't a jury be the one to decide in a case like this whether this amounts to something that's egregious or is clearly just a bona fide dispute? I believe that the concept underlying the Delaware case law is we've got to be a little bit careful about turning a jury loose against an insurance company to say, well, you know, they are not really good. Their insurance company knows that. Go get them. The case law has established certain principles. If the conduct doesn't rise to that concept of egregious or outrageous conduct, the cases say it shouldn't go to the jury. This court has affirmed several times some of the judgmental rewards in favor of insurance companies on death rate cases because of that very reason. If the case doesn't warrant that standard, then the district court judge would have to take away a verdict afterwards. We've wasted, you know, two weeks or a month of time. I think the district court did a good job of focusing on his responsibilities to judge the law of Delaware, the facts, undisputed facts of this case, and make the right decision that no contrary verdict would stand. You said you had three points. They don't meet the standard under a strict bad faith claim, and they certainly don't meet the standard under the punitive damage standard. That's a high standard from the Delaware law. Mr. Gordon, any other further questions? I'll remind my colleagues of their main issues. Thank you very much. Thank you. Mr. Spadaro? Your Honor, I think we just had an opportunity to discuss the AHA moment. The AHA moment is the AJ-295. It's the AHA moment. But, Judge Smith, you asked my brother, Mr. Pope, about, you know, couldn't the file reasonably read to say that they evaluated the claim in May 2006 at $543,000? And his answer was, well, that's one interpretation, which I think would be fairly translating. That's one reasonable interpretation. But we, the insurance company, have another. That's why jurors exist. Well, but standing alone, even if that's one interpretation, that doesn't get you what you need to avoid summary judgment. It has to be contextually that that evaluation is apparently anomalous or inconsistent with other things that were going on with respect to the handling of this claim file. I think what you're saying is that's the first tier but not the second tier of the I don't care attitude. And counsel is spending on when he says that's not their law. That's the penitent down state. But I think you can see that there was a jury issue on that faith. In terms of the difference, they say, well, we can ignore it. We can offer zero for as long as we want because they welcome the stratosphere with their demand. First of all, the last demand was $100,000 less than the finally adjudicated at body arbitration. It has respiratory effect. It was not unreasonable. It was inclusively reasonable. What was to support $900,000? I mean, there is very little medical expense and work history didn't really. What was there to support $900,000? That's what your demand was. Well, how do plaintiffs lawyers approach negotiations and settlement demands? No, that's not what I'm asking. I'm asking what was there in medical expense and work history to lead to the logical conclusion that this is worth at least $900,000? This is what it was. If you take their numbers for pain and suffering, that's $250,000 already incurred. But what was his medical expense that he had incurred? He had incurred medical expenses and past medical expenses in Las Vegas over $200,000. That's from the Bauer memo in May 2006. That's objective. So you're already at $500,000. Our projected number that our experts gave us for future Las Vegas was $419,000. But we don't know very much about that in May of 2006, do we? We're not really sure what his condition is going to be. What we're sure of, but we're not saying that it's not measured against should they have offered $900,000. That's not our case. That would not have been bad faith. That was not bad faith to meet every last cent of a demand. But bad faith isn't measured against did you offer every last cent of a demand. But what is it? It's did you offer what you knew it was worth? And they didn't know what it was worth at that point. Well, they didn't know it was worth because there's no dispute in May 2006 blue spectrum, overcoverage, over liability. That is the actual driver's liability. They know it's covered. They know that there's $250,000 in pain and suffering. They know there's over $200,000 in car numbers. And they signed this $65,000 number incorporating their experts' numbers. So there is a difference in saying, well, you're higher than the true value, so they're going to offer nothing. Thank you very much for your time. Thank you. Thank you. Case is well argued. We'll take it under advisement. Thank you.